40 A.3d 396

**Elliott McCLAIN**

v.

**STATE of Maryland.**

**No. 17, Sept. Term, 2010.**

Court of Appeals of Maryland.

March 21, 2012.

Kellie M. Black, Assistant Public Defender (Paul B. De-Wolfe, Public Defender, Baltimore, MD), on brief, for Petitioner.

Gary E. O'Connor, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY *, ADKINS and BARBERA, JJ.

BARBERA, J.

Petitioner Elliott McClain was convicted by a jury in the Circuit Court for Baltimore City of first degree murder and related offenses. At trial, the State offered into evidence an audiotape of a prior statement by a State's witness, Sheila Billings, without explicitly offering at that time a theory for its admission. The trial court admitted that audiotape, among other items of physical evidence, saying that it was admissible as either a prior consistent statement or a prior inconsistent statement.

Petitioner asks us to decide whether the court erred in admitting the audiotape statement of Ms. Billings, given that the State did not offer the grounds for admission and the court did not make explicit findings regarding admissibility. We are also asked to decide whether the trial court erred in sending to the jury room during deliberations, absent a specific request from the jury, the audiotape statement of Ms.

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court. He did not participate in the decision or adoption of this opinion.

Billings and other prior audiotape statements that were admitted into evidence. For the following reasons, we hold that the trial court did not err in either respect.

## I.

This case arises out of the death of Tidell Harris, who was shot during the early morning hours of June 1, 2004. The next day, Kerwayne Stanton was arrested on drug related charges. He informed the arresting officer that he had witnessed the shooting the previous night. The police transported Stanton to the police station, where he spoke with Detective Ron Ciraolo. Based on information that Stanton supplied, Detective Ciraolo prepared two photographic arrays. Stanton identified the photographs of the Petitioner, Elliott McClain, also known as "Goo" or "Gooh," and Kevin Fletcher, known as "Pooh," as depicting the two gunmen who shot Harris, known as "Popcorn" (hereafter, "the victim"). Stanton then provided a recorded statement of his account of the incident.

During the days that followed, Detective Ciraolo separately questioned Fletcher and Petitioner at the police station. Fletcher gave a recorded statement in which he implicated himself and Petitioner in the shooting of the victim. Petitioner, at his interview, told Detective Ciraolo the following: he was at Sooner's Bar on the night of the shooting; the victim came into the bar, remained there for a short time, then left; thereafter, Petitioner heard gunshots outside, looked out the window, and saw a man lying in the street; Petitioner then told Sheila Billings, a server at the bar, to call the police.

Several months later, Detective Ciraolo conducted an audiotaped interview of Sheila Billings. Billings told Detective Ciraolo that, on the night of the shooting, Petitioner and the victim were in the bar; the victim left about thirty minutes before Petitioner himself left the bar; then a girl ran into the bar and said that the victim had been shot, outside. The audiotape contains the following exchange between Detective Ciraolo and Billings:

[Ciraolo]: Um, Miss Billings, do you remember or can you remember after Gooh [Petitioner] left the bar about how much time went by before the girl came running back in saying that ah . . .

[Billings]: Well, ah, when the girl ran in I believe that was before he left. Ah, it was about, now I might be wrong on this, it, it was either just right, right after she came in and said it or it was right before and I'm not real clear on that.

[Ciraolo]: Okay.

[Billings]: Okay, so I'm not so, I believe it was, no I'm wrong. It was like thirty minutes. He left and it's right before he was, that girl came in, when she ran in and said he was shot and he had left.

[Ciraolo]: So . . .

[Billings]: And he never, he never came back.

[Ciraolo]: So he was already out of the bar . . .

[Billings]: Right.

[Ciraolo]: when the girl came in . . .

[Billings]: Right.

[Ciraolo]: and told you . . .

[Billings]: That's correct, yes.

[Ciraolo]: Okay, um, it's a little confusion.

[Billings]: Right.

[Ciraolo]: Just to clarify, Popcorn [the victim] left . . .

[Billings]: Yes.

[Ciraolo]: Gooh [Petitioner] left . . .

[Billings]: Yes.

[Ciraolo]: Sometime after that the girl came in and said he was shot?

[Billings]: Right.

At trial, the State called Billings to testify about the events of June 1, 2004. Contrary to her audiotaped statement to Detective Ciraolo, in which she stated that Petitioner left the bar after the victim but before the report that the victim had

been shot, Billings answered "yes," when asked whether Petitioner was still in the bar when the girl ran in and said someone had been shot. The State then attempted to show Billings a transcript of her November 2004 interview with Detective Ciraolo, and, upon defense counsel's request, the following bench conference took place:

[Defense]: Your Honor, I object to giving the witness anything to refresh her recollection. She testified to something, and she does not need the document to refresh her recollection for any purpose. She was asked a question, and she answered it.

[The Court]: Well, if she answered the question inconsistently or incorrectly with regard to her previous statement, the State can certainly put the statement in front of her, and see if that refreshes her recollection.

[Defense]: Very good. But there's no foundation which would suggest that we needed that, Your Honor, so to allow her to review the document before that question is asked is problematic.

[The Court]: I disagree.

[Defense]: All right.

[The Court]: You all have had an opportunity to review the statement, I mean I assume—what's your proffer, [State]? Why are you putting the statement in front of her?

[State]: She advised the police that Goo [Petitioner] left after Popcorn [the victim], and it was before the individual came in and said somebody had been shot.

[Defense]: The statement actually says that Goo [Petitioner] was in the bar. The statement says that Goo [Petitioner] was in the bar when the person came in, and then after police questioning she says, "Well, I don't really recall which." So it's not a matter of whether or not she recalls as she is sitting here today; it's a question of whether or not the State can show that the police managed to turn her statement around into something more ambiguous, and that's inappropriate as a purpose for her

reviewing this statement at this point in time, Your Honor.

[The Court]: Well what does the statement say, [State]?

[State]: Would you like a copy?

[The Court]: Sure.

(State hands document to the Court.)

[The Court]: And you direct me to what?

[State]: Well, really, the whole thing, but more towards the end, where they ask her—

[The Court]: Well, where?

[State]: On page 2, it said "Did somebody follow Popcorn out of the bar?" She said, "Goo." As it goes on, there is one portion where she is unclear, however, she does ultimately say that Goo followed Popcorn out of the bar, and that Goo was not in the bar when the individual came in and said somebody had been shot.

[The Court]: Well this doesn't say Goo followed Popcorn out of the bar. It says—thirty minutes afterwards?

[State]: That's what she said initially, yes.

[The Court]: And your proffer is, that means that Goo followed Popcorn out of the bar because he left thirty minutes after Popcorn did?

[State]: My whole point in calling her is to show that you can't hear the shots from the bar, and to show that the Defendant was not in the bar when the individual came in and said that Popcorn had been shot. Because as I'm sure Your Honor recalls from the Defendant's statement, he said when the shots rang out, he heard them, and he was looking Ms. Sheila [Billings] in her face. However, in the statement to police, she stated that Goo was not in the bar when the individual came in and said somebody had been shot.

[The Court]: All right. I'm going to overrule the objection. She can look at her statement—

Billings reviewed the transcript of her statement to police and stated that it refreshed her recollection. She then testi-

fied that Petitioner left the bar before the woman came in and said Harris had been shot. The State asked Billings whether the police had told her what to say during the audiotaped interview. To that question, Billings answered, "Oh, no."

Following Petitioner's re-cross examination of Billings, the State moved to admit the taped statement into evidence, without specifying a basis for admission. Counsel for Petitioner entered a general objection, and the trial judge replied, simply, "Overruled. In it comes." At that point, the audiotape was played for the jury.

After closing arguments, the trial court considered whether to send to the jury room the taped statements of Billings, Stanton (the arrestee who identified the photos of Petitioner and Fletcher as the men who were involved in the shooting), and Fletcher—the latter two of which also had been admitted into evidence.[1] The State advocated for the audiotapes to be sent to the jury room, citing Maryland Rule 4–326(b).[2] Counsel for Petitioner argued that sending the tapes to the jury room would be prejudicial insofar as it would allow the jury to listen repeatedly to them. The trial court, when describing the three taped statements, stated: "They were all admitted as either ... prior inconsistent statements or statements

---

**1.** The taped statement by Stanton to the police was admitted as both a prior inconsistent statement and a prior consistent statement. Fletcher's taped statement to police was admitted as a prior inconsistent statement. Petitioner does not challenge in this Court the admission of those two statements.

**2.** Maryland Rule 4–326(b) provides:

(b) **Items taken to jury room.** Sworn jurors may take their notes with them when they retire for deliberation. Unless the court for good cause orders otherwise, the jury may also take the charging document and exhibits that have been admitted in evidence, except that a deposition may not be taken into the jury room without the agreement of all parties and the consent of the court. Electronically recorded instructions or oral instructions reduced to writing may be taken into the jury room only with the permission of the court. On request of a party or on the court's own initiative, the charging documents shall reflect only those charges on which the jury is to deliberate. The court may impose safeguards for the preservation of the exhibits and the safety of the jury.

consistent that were admitted to rehabilitate after cross examination." A bit later the court said, in reference to the taped statements of Billings and Stanton, that both "were offered into evidence by the State pursuant to Maryland Rule 5-802.1(a) and/or (b). . . ." The court then ordered the tapes sent to the jury room, explaining that the tapes are items of evidence that the jurors "are entitled to review and are required to consider in the course of their deliberations."

The jury found Petitioner guilty of first degree murder, conspiracy to commit murder, and related handgun offenses. Petitioner appealed and the Court of Special Appeals affirmed the convictions in an unreported opinion. He then petitioned this Court for a writ of certiorari, which we granted, to answer the following questions:

1. Where a witness's taped statement to police is offered and used for the purpose of refreshing recollection, may an appellate court affirm the admission of the tape into evidence under the theory that the statement was admissible as both a prior inconsistent statement and a prior consistent statement, where the prosecutor did not offer the statement under these hearsay exceptions, and where the trial court did not make the requisite findings of fact?

2. May a trial court, over defense counsel's objection, send testimonial exhibits to the jury room at the beginning of deliberation where the jury did not ask to review those exhibits?

## II.

Petitioner claims that the trial court erred in admitting Billings's taped statement into evidence. He contends that the statement was used only to refresh Billings's recollection, pursuant to Maryland Rule 5-612, and was inadmissible under that Rule. The State, however, does not argue that Billings's statement was admissible under Rule 5-612. The State instead argues that Billings's statement was admissible under

Maryland Rule 5–802.1,[3] as either a prior inconsistent, or prior consistent, statement. In so arguing, the State acknowledges that the prosecution did not give a theory of admission when offering the statement into evidence. Petitioner counters that the prior statement does not satisfy the requirements of Rule 5–802.1, and the trial court failed to make requisite findings of fact necessary to admit evidence under that Rule. We conclude, for the reasons that follow, that the court admitted the audiotape as a prior inconsistent statement, under Rule 5–802.1(a), and the court did not err in doing so.

The State first produced the transcript of Billings's prior statement, at trial, after Billings testified that Petitioner was in the bar when the woman entered and said the victim had been shot. During the ensuing bench conference, counsel for Petitioner objected "to giving the witness anything to refresh her recollection." The court responded: "Well, if she answered the question *inconsistently or incorrectly with regard to her previous statement*, the State can certainly put the statement in front of her, and see if that refreshes her recollection." (Emphasis added.) The State explained that it called Billings as a witness "to show that the Defendant was not in the bar when the individual came in and said that Popcorn had been shot ... [and] in the statement to police, [Billings] stated that Goo [Petitioner] was not in the bar when the individual came in and said somebody had been shot." The court then overruled Petitioner's objection, allowing Billings to review her prior statement. In short, the bench

---

3. Maryland Rule 5–802.1 provides, in relevant part:
 The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:
 (a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition; (2) reduced to writing and was signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement;
 (b) A statement that is consistent with the declarant's testimony, if the statement is offered to rebut an express or implied charge against the declarant of fabrication, or improper influence or motive.

conference included references both to refreshing Billings's recollection, and to the inconsistency between her initial testimony at trial and her statement to Detective Ciraolo.

When the State later offered Billings's audiotaped statement into evidence, the court admitted the statement without articulating the basis for doing so. We reject the possibility that the court admitted the taped statement as a statement used to refresh recollection. Indeed, given the absence of any express ruling to the contrary, we readily can—and do—indulge the presumption that the trial court knew full well that the audiotaped statement was not admissible under a theory of refreshed recollection. *See Germain v. State,* 363 Md. 511, 534, 769 A.2d 931, 944 (2001) ("When a party uses an earlier statement of his own witness to refresh the witness' memory, the only evidence recognized as such is the testimony so refreshed; and the party may not put the statement in evidence . . . .") (quoting *United States v. Rappy,* 157 F.2d 964, 967 (2d Cir.1946)). Removing any doubt in that regard is that the trial court, when deciding whether to send to the jury room the taped statements of Billings and Stanton, said the statements of those two witnesses "were offered into evidence by the State pursuant to Maryland Rule 5–802.1(a) and/or (b). . . ."

Petitioner seizes upon the statement we have just quoted to argue that the court incorrectly "lumped" together the audiotaped statements of Billings and Stanton by characterizing both as having been admitted into evidence as prior inconsistent and/or prior consistent statements. That mis-characterization, Petitioner claims, is the result of the State's failure to provide a ground for admission of Billings's taped statement. Petitioner, however, does not point to any evidence clearly suggesting that Billings's statement was admitted under any Rule other than 5–802.1. In the absence of any such evidence proving otherwise, we take the trial court at its word.

We are equally convinced that the trial court admitted the audiotaped statement as a prior inconsistent statement under Rule 5–802.1(a). Indeed, the discussion among the court and

counsel that preceded the court's admission of Billing's audio-taped statement reflects the court's acceptance of the State's proffer that the audiotaped statement would be inconsistent with Billings's initial testimony. The next question, then, is whether the court correctly admitted Billings's audiotaped statement under Rule 5–802.1(a).[4]

In order to be admissible under section (a) of the Rule, the prior statement must be "inconsistent with the declarant's testimony" and either: (1) made under oath at a qualifying proceeding; (2) made in writing and signed by the declarant; or, pertinent to the facts of this case (3) "recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement. . . ." As for the former requirement, Billings told Detective Ciraolo that Petitioner had left the bar before the woman entered and said the victim had been shot. That is inconsistent with her initial testimony at trial that Petitioner was in the bar when the woman entered. As for the pertinent latter requirement, Billings's prior statement was audiotape-recorded by the police during an interview with her; therefore, the audiotape offered by the State is "substantially verbatim," recorded by "electronic means," and "contemporaneous[ ] with the making of the statement." The prior statement, therefore, satisfies the requirements of Rule 5–802.1(a).

■ Petitioner argues that the statement was not inconsistent because, after being shown the statement to refresh her recollection, Billings amended her testimony to say that Petitioner left the bar before the woman entered; therefore, at the time the statement was admitted into evidence after recross examination, it was not inconsistent with the amended testimony. Petitioner's argument incorrectly discounts Billings's initial, unequivocal testimony that Petitioner did not leave the bar after the victim left but before the woman

---

4. Because, as we shall discuss, the court committed no error in admitting the statement as a prior inconsistent statement under Rule 5–802.1(a), we do not address whether it also was admissible as a prior consistent statement under Rule 5–802.1(b).

entered. That initial testimony, though subsequently amended, could have influenced the jurors.

When a jury is presented with such conflicting testimony from a single witness, courts cannot speculate as to which side of the contradiction the jury will assign greater credibility. *See Bellamy v. State,* 403 Md. 308, 332, 941 A.2d 1107, 1121 (2008) (explaining that "what evidence to believe, what weight to be given it, and what facts flow from that evidence are for the jury ... to determine") (quoting *Dykes v. State,* 319 Md. 206, 224, 571 A.2d 1251, 1260–61 (1990)). In this case, the trial court's allowing the prior statement into evidence provided an additional source from which the credibility of the inconsistent portions of Billings's testimony could be considered. *See* 6 Lynn McLain, *Maryland Practice: Maryland Evidence State and Federal* § 613:1(a) (2d ed. 2001) (stating that, when a witness's testimony is inconsistent with a prior statement of the witness, "[t]he inference may then be made that the witness could not have been correct both times and may be wrong at trial, either because of faulty memory or deliberate prevarication"). When determining whether inconsistency exists between testimony and prior statements, "in case of doubt the courts should lean toward receiving such statements to aid in evaluating the testimony." Kenneth S. Broun, *McCormick on Evidence* § 34, p. 153 (6th ed. 2006). *Cf.* Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 1302[F] (4th ed. 2010) ("Flat contradiction ... is not the only test of inconsistency.... [C]ontrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony." (quoting *Jencks v. United States,* 353 U.S. 657, 667, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957))). For purposes of Rule 5–802.1(a), Billings's prior statement to Detective Ciraolo was inconsistent with her initial testimony at trial.

■ Petitioner further argues that, even if the prior statement of Billings otherwise satisfied the requirements of Rule 5–802.1(a), the trial court erred by not making express findings, on the record, that those requirements were met. Spe-

cifically, Petitioner interprets Rule 5–104(a) as demanding that such findings be made expressly before a prior statement may be admitted into evidence. The State disagrees, asserting that the language of Rule 5–104(a) contains no such requirement and pointing out that this Court in *Davis v. State*, 344 Md. 331, 339, 686 A.2d 1083, 1086 (1996), held that no explicit finding of inconsistency is required for admission of evidence under Rule 5–802.1(a).

Rule 5–104(a) provides: "Preliminary questions concerning ... the admissibility of evidence shall be determined by the court...."[5] In support of his interpretation of the Rule, Petitioner cites *Corbett v. State*, 130 Md.App. 408, 746 A.2d 954 (2000). In *Corbett*, the Court of Special Appeals was asked to determine if, when a witness testifies that he or she does not remember a particular event, that testimony is, for purposes of Rule 5–802.1(a), "inconsistent" with an earlier written statement by the witness about the event. *Id.* at 421, 746 A.2d at 960. The Court of Special Appeals held that the inability to remember is "inconsistent" with the prior statement if such memory loss is falsely professed in order to avoid testifying on the matter at issue. *Id.* at 425–26, 746 A.2d at 963. The Court of Special Appeals explained that it was "confronted with an absence of any finding on the issue" of whether the witness's memory loss was feigned or genuine. *Id.* at 426, 746 A.2d at 963. As a result, the Court of Special Appeals concluded: "The court erred in permitting [the witness's] statement to come into evidence as a prior inconsistent statement without first making a finding on that preliminary, predicate issue." *Id.* at 426–27, 746 A.2d at 963 (citing Rule

---

5. Maryland Rule 5–104(a) reads, in full:
 (a) **Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of section (b). In making its determination, the court may, in the interest of justice, decline to require strict application of the rules of evidence, except those relating to privilege and competency of witnesses.

5–104). Nowhere, however, does the *Corbett* Court require that such a finding be made on the record.

Unlike in *Corbett*, the facts of this case demonstrate that the trial court made a finding, albeit implicitly, on the admissibility of Billings's audiotaped statement as a prior inconsistent statement. During the bench conference that preceded the court's allowing the statement into evidence, the court itself inquired whether Billings testified "inconsistently or incorrectly" when compared with her prior statement, and evidently, based on the State's proffer, found that the two were inconsistent. Later, the court announced that the audiotaped statement was admitted under Rule 5–802.1. The court's comments certainly indicate, even if not expressly, that the court admitted the statement as a prior inconsistent statement under the Rule. We presume, moreover, that the court recognized its obligations to satisfy itself of the existence of the two prerequisites for admission of the statement under that Rule. *See Davis*, 344 Md. at 339, 686 A.2d at 1086 (stating that the trial court's determination of inconsistency in witness statements was implied, when supported by the record, because "judges are presumed to know and, properly to have applied, the law").

The Court of Special Appeals in *Corbett* emphasized that "the decision whether a witness's lack of memory is feigned or actual is a demeanor-based credibility finding that is within the sound discretion of the trial court to make," and such a decision cannot be made "from the cold record." 130 Md.App. at 426, 746 A.2d at 963. In the instant case, however, there is no need for the trial court to have made a "demeanor-based credibility finding." Unlike the witness in *Corbett*, Billings did not assert an inability to remember the events surrounding the shooting; moreover, the "cold record" itself demonstrates the inconsistency between Billings's initial testimony and her prior audiotaped statement.

Finally, Rule 5–802.1, unlike some other Rules, does not require explicitly that findings be placed on the record, and we decline to read into the Rule such a requirement. *See Powell*

*v. State,* 394 Md. 632, 641 n. 7, 907 A.2d 242, 247 n. 7 (2006) (citing Maryland Rules 4–222(c), 4–314(a)(3) and 4–342(g)—the language of each of which explicitly requires the court to make findings on the record—as support for holding that a Rule will not be interpreted to include such a requirement when it contains no explicit language mandating that findings be placed on the record).

We hold that the trial court committed no error by admitting into evidence the taped recording of Billings's prior statement to Detective Ciraolo.

## III.

 Next, Petitioner argues that the trial court erred when, at the beginning of the jury's deliberations, the court sent to the jury room the audiotaped statements of Billings, Stanton, and Fletcher. Petitioner's argument is two-fold: (1) sending the audiotapes violated Rule 4–326(b)'s prohibition on sending "depositions" to the jury room because the taped statements were, for all relevant intents and purposes, depositions; and (2) Rule 4–326(c) [6] allows evidence to be sent to the jury only upon request, and in this case the jury made no such request to have the audiotapes. For the reasons discussed below, we hold that the court did not err in sending the audiotaped statements to the jury room.

Rule 4–326(b) provides that, "[u]nless the court for good cause orders otherwise," jurors may take to the jury room "the charging document and exhibits that have been admitted in evidence, except that a deposition may not be taken into the jury room without the agreement of all parties and the consent of the court." Section (c) of Rule 4–326 states that a court "may make available to the jury testimony or other

---

6. Maryland Rule 4–326(c) reads:

 (c) **Jury request to review evidence.** The court, after notice to the parties, may make available to the jury testimony or other evidence requested by it. In order that undue prominence not be given to the evidence requested, the court may also make available additional evidence relating to the same factual issue.

evidence requested by it." Recently, in *Adams v. State*, we explained the scope of sections (b) and (c):

> We construe Rule 4–326(b) as meaning precisely what it says: that, "unless the court for good cause orders otherwise," exhibits admitted into evidence may be taken to the jury room by the jury while it deliberates. For the Rule to have meaning apart from section (c), the "good cause" order must relate to specific exhibits and be made as to it or them prior to the jury being excused to deliberate.
>
> \* \* \*
>
> Section (c) applies only where the request by the jury is for "testimony" or "other evidence," not admitted as an exhibit, and not therefore permitted to accompany the jury to the jury room.

415 Md. 585, 599–600, 4 A.3d 499, 507–08 (2010). In other words, section (b) of Rule 4–326 presumes all exhibits in evidence, except for depositions, may go to the jury room unless "good cause" exists to withhold them from the jury. Here, the audiotapes in question had been admitted into evidence as exhibits, and, therefore, section (b) guides our inquiry.

We decline to endorse Petitioner's argument that the audiotaped statements are "depositions" for purposes of section (b). When interpreting the Maryland Rules, "if the language of a rule is clear and unambiguous, it will be applied thusly in a common-sense manner." *Brown v. Daniel Realty Co.*, 409 Md. 565, 585, 976 A.2d 300, 311 (2009). The term "deposition" in Rule 4–326(b) is clear and specific, as evidenced by the detailed descriptions in Rule 4–261 of when a "deposition" may be taken in a criminal case, the manner in which it shall be taken, and the circumstances under which it may be used at trial. Specifically, Rule 4–261(d) instructs that "[t]he procedure for taking a deposition shall be as provided by Rules 2–401(f), 2–414, 2–415, 2–416, and 2–417(b) and (c)." The audiotaped statements in this case do not meet those procedural requirements.

Under Rule 2–414(a), a "deposition" conducted in Maryland "shall be taken before any person authorized to administer an oath." In addition, under Rule 2–415(a), "[t]he deponent shall be put on oath by the officer before whom a deposition is taken. . . ." In none of the three taped statements at issue was the witness placed under oath by anyone, let alone by a "person authorized to administer an oath." Accordingly, the statements are not "depositions" for purposes of Rule 4–326(b).

■ Under Rule 4–326(b), "[e]xhibits admitted into evidence may go to the jury room absent some specific reason, *i.e.*, good cause, to exclude them." *Adams*, 415 Md. at 601, 4 A.3d at 508. Whether "good cause" exists to withhold admitted evidence from the jury is a determination left to the discretion of the trial court and will only be overturned on appeal if the trial court abused that discretion. *Id.* at 589, 4 A.3d at 501.

■ In the present case, the trial court heard arguments from both sides before sending the audiotapes to the jury room. Defense counsel asserted that "it prejudices my client with the tapes being played repeatedly in the jury room without benefit of testimony. . . . They do not have that to deliberate with in the jury room and this tape that's being pounded on these jurors over and over and over, it becomes problematic." In subsequently ruling that the tapes would be provided to the jury, the court explained that "we're not forcing the jurors to listen to the tapes. It's as any other piece of evidence. It's up there for their review should they choose to review it." The court then highlighted other evidence that would be sent to the jury room along with the audiotapes, including exhibits submitted by the defense.

From this record, it is clear to us that the trial court considered and reasonably rejected the Defense's argument concerning potential "good cause" for withholding the tapes from the jury. We therefore hold that the trial court did not abuse its discretion in sending to the jury room the taped statements of Billings, Stanton, and Fletcher.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

BELL, C.J., dissenting.

The majority affirms the decision of the Court of Special Appeals, which, in this case, holds that an audio-taped statement, as transcribed, that is consistent with the witness' trial testimony is nonetheless admissible as a prior inconsistent statement. I disagree and, therefore, dissent.

## I.

The petitioner, Elliott McClain, was convicted, by a jury, in the Circuit Court for Baltimore City, of the first degree murder of Tidell Harris, conspiracy to commit that murder, and related handgun offenses. The convictions arose out of a shooting that occurred outside of Sooner's Bar in Baltimore. Kerwayne Stanton, who had been arrested for possession of controlled dangerous substances, identified the petitioner, also known as "Goo", and Kevin Fletcher, identified as "Pooh," from photo arrays as the two men who shot Mr. Harris.

Unlike Mr. Fletcher, who, in an audio-taped statement, implicated himself and the petitioner in the shooting,[1] the petitioner denied any involvement at all. Indeed, although he admitted being at Sooner's Bar on the night of the shooting, and witnessing the victim enter the bar and leave shortly thereafter, he informed Detective Ciraolo, the investigating detective, that he was still in the bar when he heard gunshots

---

1. At trial, Mr. Fletcher recanted his statement. He acknowledged that he had entered into a plea agreement with the State, but testified that he did not remember seeing the petitioner on the date of the incident, and, furthermore, that he did not even remember being present outside of Sooner's Bar on the date of the shooting. Mr. Fletcher conceded that the information he had provided to Detective Ciraolo had been fabricated, but maintained that it was because the detectives had promised him a reduced sentence in exchange for a statement implicating himself and the petitioner in the shooting. In addition, he stated, that he had been assaulted by the officers that took him into custody, prior to making his audio-taped statement, and also, that he was denied the opportunity to speak to his mother, or to an attorney, upon request.

outside and, only later, saw the victim lying in the street. The petitioner also said that he instructed Sheila Billings, a barmaid who was working on the night of the shooting, to call the police.

Detective Ciraolo subsequently interviewed Sheila Billings. She gave a statement, which was audio-taped, as follows:

"[Ciraolo]: Um, Miss Billings, do you remember or can you remember after Gooh [the petitioner] left the bar about how much time went by before the girl came running back in saying that ah . . .

"[Billings]: Well, ah, when the girl ran in I believe that it was before he left. Ah, it was about, now I might be wrong on this, it, it was either just right, right after she came in and said it or it was right before and I'm not real clear on that.

"[Ciraolo]: Okay.

"[Billings]: Okay, so I'm not so, I believe it was, no I'm wrong. It was like thirty minutes. He left and it's right before he was, that girl came in, when she ran in and said he was shot and he had left.

"[Ciraolo]: So . . .

"[Billings]: And he never, he never came back.

"[Ciraolo]: So he was already out of the bar . . .

"[Billings]: Right.

"[Ciraolo]: When the girl came in . . .

"[Billings]: Right.

"[Ciraolo]: and told you . . .

"[Billings]: That's correct, yes.

"[Ciraolo]: Okay, um, it's a little confusion.

"[Billings]: Right.

"[Ciraolo]: Just to clarify, Popcorn [the victim] left . . .

"[Billings]: Yes.

"[Ciraolo]: Gooh [the petitioner] left . . .

"[Billings]: Yes.

"[Ciraolo]: Sometime after that the girl came in and said he was shot?

"[Billings]: Right."

At trial, the prosecution called Ms. Billings as a witness. She testified that she was familiar with both the petitioner, and Mr. Harris, the victim. She remembered the victim entering the bar on the night of the shooting, but not being permitted to stay, he left soon thereafter. She recalled, also, that the petitioner was present at Sooner's Bar at that time. She then testified that, at a later point during the night, a girl ran into the bar and informed her that the victim had been shot; she had not heard the gunshots over the loud music in the bar. When asked whether the petitioner was still in the bar when the girl came in and informed her that the victim had been shot, she answered "yes," stating that he was, indeed, present with a friend. That was contrary to her statement.

The State's attempt to provide Ms. Billings with a transcript of her November, 2004 statement to refresh her recollection prompted the petitioner's objection, resulting in a bench conference. At the bench, the following ensued:

"[Defense]: Your Honor, I object to giving the witness anything to refresh her recollection. She testified to something, and she does not need the document to refresh her recollection for any purpose. She was asked a question, and she answered it.

"[The Court]: Well, if she answered the question inconsistently or incorrectly with regard to her previous statement, the State can certainly put the statement in front of her, and see if that refreshes her recollection.

"[Defense]: Very good. But there's no foundation which would suggest that we needed that, Your Honor, so to allow her to review the document before that question is asked is problematic.

"[The Court]: I disagree.

"[Defense]: All right.

"[The Court]: You all have had an opportunity to review the statement, I mean I assume—what's your proffer, [State]? Why are you putting the statement in front of her?

"[State]: She advised the police that Goo [the petitioner] left after Popcorn [the victim], and it was before the individual came in and said somebody had been shot.

"[Defense]: The statement actually says that Goo [Petitioner] was in the bar. The statement says that Goo [Petitioner] was in the bar when the person came in, and then after police questioning she says, "Well, I don't really recall which." So it's not a matter of whether or not she recalls as she is sitting here today; it's a question of whether or not the State can show that the police managed to turn her statement around into something more ambiguous, and that's inappropriate as a purpose for her reviewing the statement at this point in time, Your Honor.

"[The Court]: Well, what does the statement say, [State]?

"[State]: Would you like a copy?

"[The Court]: Sure.

(State hands document to the Court.)

"[The Court]: And you direct me to what?

"[State]: Well, really, the whole thing, but more towards the end, where they ask her—

"[The Court]: Well, where?

"[State]: On page 2, it said 'Did somebody follow Popcorn out of the bar?' She said, 'Goo.' As it goes on, there is one portion where she is unclear, however, she does ultimately say that Goo followed Popcorn out of the bar, and that Goo was not in the bar when the individual came in and said somebody had been shot.

"[The Court]: Well this doesn't say Goo followed Popcorn out of the bar. It says—thirty minutes afterwards?

"[State]: That's what she said initially, yes.

"[The Court]: And your proffer is, that means that Goo followed Popcorn out of the bar because he left thirty minutes after Popcorn did?

"[State]: My whole point in calling her is to show that you can't hear the shots from the bar, and to show that the Defendant was not in the bar when the individual came in and said that Popcorn had been shot. Because as I'm sure Your Honor recalls from the Defendant's statement, he said when the shots rang out, he heard them, and he was looking Ms. Sheila [Billings] in her face. However, in the statement to the police, she stated that Goo was not in the bar when the individual came in and said somebody had been shot.

"[The Court]: All right. I'm going to overrule the objection. She can look at her statement—"

After reviewing the transcript of her statement, Ms. Billings declared her recollection refreshed and proceeded to testify consistently with her statement. In that regard, she responded, when asked, that the petitioner was not in the bar when the girl ran in and informed her that the victim had been shot. She also, again consistently, testified that she could not hear the shooting over the loud music in the bar.

Following this exchange, the petitioner's cross-examination, and subsequent questioning by the parties, the State moved, without specifying a basis for admission, to admit Ms. Billings' statement into evidence. The petitioner's objection was overruled, the trial judge ruling, simply, "[i]n it comes." Thereafter, the audio-tape of the statement was played for the jury. At the conclusion of the trial, the court approved sending the audio-taped statement to the jury room. In so doing, the trial court concluded that the statements "were offered into evidence by the State pursuant to Maryland Rule 5–802.1(a) and/or (b)," [2] and that the jurors "are entitled to review and

---

2. Maryland Rule 5–802.1 provides, in relevant part, that "[t]he following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule":

are required to consider [them] in the course of their deliberations." Op. at 246, 40 A.3d at 400.

The petitioner noted an appeal to the Court of Special Appeals. There, he argued, *inter alia,* that in accordance with Maryland Rule 5–612,[3] Ms. Billings' prior statement neither should have been admitted as an exhibit, nor played for the jury after being used to refresh the witness' recollection. The intermediate appellate court, in an unreported opinion, rejected those arguments and, thus, affirmed the judgments. It agreed with the trial court that Maryland Rule 5–802.1(a) and (b), rather than Rule 5–612, applied.

The petitioner filed with this Court a petition for writ of certiorari, asking that we answer the following question:[4]

"(a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition; (2) reduced to writing and was signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement;

"(b) A statement that is consistent with the declarant's testimony, if the statement is offered to rebut an express or implied charge against the declarant of fabrication, or improper influence or motive...."

3. Maryland Rule 5–612 states:

"If, while testifying, a witness uses a writing or other item to refresh memory, any party is entitled to inspect it, to examine the witness about it, and to introduce in evidence those portions which relate to the testimony of the witness for the limited purpose of impeaching the witness as to whether the item in fact refreshes the witness's recollection."

4. This Court also granted certiorari to address a second question:

"May a trial court, over defense counsel's objection, send testimonial exhibits to the jury room at the beginning of deliberation where the jury did not ask to review those exhibits?"

The petitioner argues that sending those tapes to the jury room violated Rule 4–326, which provides, in relevant part:

"(b) Items taken to jury room. Sworn jurors may take their notes with them when they retire for deliberation. Unless the court for good cause orders otherwise, the jury may also take the charging document and exhibits that have been admitted into evidence, except that a deposition may not be taken into the jury room without the agreement of all parties and the consent of the court. Electronically

"Where a witness's taped statement to police is offered and used for the purpose of refreshing recollection, may an appellate court affirm the admission of the tape into evidence under the theory that the statement was admissible as both a prior inconsistent statement and a prior consistent statement, where the prosecutor did not offer the statement under these hearsay exceptions, and where the trial court did not make the requisite findings of fact?"

The majority affirms the decision of the Court of Special Appeals. Like that court, it holds that the trial court correctly admitted Ms. Billings' statement, audio-tape and transcript, as a prior inconsistent statement, pursuant to Maryland Rule 5–802.1(a). Op. at 247–48, 40 A.3d at 401. The majority reasons that the bench conference, alone, did not clearly indicate the purpose for which Ms. Billings' statement would be admitted into evidence. Since there were references to refreshing her recollection, as well as to the statement being inconsistent with her prior audio-taped statement, *id.*, apparently giving the trial court the benefit of the doubt, the majority "reject[s] the possibility that the court admitted the taped statement as

recorded instructions or oral instructions reduced to writing may be taken into the jury room only with the permission of the court. On request of a party or on the court's own initiative, the charging documents shall reflect only those charges on which the jury is to deliberate. The court may impose safeguards for the preservation of the exhibits and the safety of the jury.

"(c) Jury request to review evidence. The court, after notice to the parties, may make available to the jury testimony or other evidence requested by it. In order that undue prominence not be given to the evidence requested, the court may also make available additional evidence relating to the same factual issue."

The petitioner asserts this violation on the grounds that, first, taped statements could be considered depositions which, under the rule, may not be sent to the jury room, and, second, because the jury did not request the tapes in accordance with Rule 4–326(c). In this regard, also, the majority holds that the trial court did not err because "Rule 4–326 presumes all exhibits in evidence, except for depositions, may go to the jury room unless 'good cause' exists to withhold them from the jury," and, furthermore, that the tapes cannot be considered "depositions" within the meaning of the rule. Op. at 253–55, 40 A.3d at 405–06. Because the majority's conclusion is predicated on the assumption that the items submitted to the jury were, at the outset, properly in evidence, I decline to reach this issue.

a statement used to refresh recollection," and holds, instead, that "given the absence of any express ruling to the contrary, we can readily indulge the presumption that the trial court knew full well that the audio-taped statement would not be admissible under such a theory." Op. at 248, 40 A.3d at 401. Having concluded that "the trial court admitted the audio-tape as a prior inconsistent statement under Rule 5–802.1(a)," op. at 247, 40 A.3d at 401, the majority opts not to address the possibility that the statement may have been admitted as a prior consistent statement under Rule 5–802.1(b). Op. at 249, n. 4, 40 A.3d at 402, n. 4.

To the petitioner's contention that the Billings statement could not have been admitted as a prior inconsistent statement because, at the time it was admitted, Ms. Billings' trial testimony was consistent with her statement, and although she had testified inconsistently on one occasion, and in only one particular, once her recollection was refreshed, she changed her testimony such that it mirrored what was contained in her audio-taped statement, the majority responds that the jury could still have been influenced by her earlier testimony that Mr. McClain was still in the bar when the girl ran in and informed her that there had been gunshots outside. Op. at 249–50, 40 A.3d at 402–03. The majority also disagrees with the petitioner's argument that, prerequisite to admission of evidence pursuant to Rule 5–802.1(a), preliminary evidentiary findings as to the basis of the offer must be made on the record, in accordance with Rule 5–104(a).[5] It is satisfied, in that regard, that the trial court implicitly "recognized its

---

5. Maryland Rule 5–104(a) provides:

"Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of section (b). In making its determination, the court may, in the interest of justice, decline to require strict application of the rules of evidence, except those relating to privilege and competency of witnesses."

obligation to satisfy itself of the existence of the two prerequisites for admission of the statement under that Rule," and that this finding was not required by Rule 5–104(a) to be on the record. Op. at 251–52, 40 A.3d at 403–04. The majority accordingly concludes that the trial court did not commit error when it admitted the audio-taped recording of Ms. Billings' prior statement into evidence. Op. at 252–53, 40 A.3d at 404–05.

I believe that it was improper, after the transcript of Ms. Billings' statement had sufficiently refreshed her recollection, for the audio-tape of that statement to be admitted as evidence.

## II.

The trial court erred when it admitted the audio-tape of Ms. Billings' statement into evidence because it did not qualify for admission under any of the hearsay exceptions. Clearly, it could not be admitted under Rule 5–612; after Ms. Billings' recollection had been refreshed, it failed to meet the requirements of that rule—it was not offered "for the limited purpose of impeaching the witness as to whether the item in fact refreshed the witness's recollection." Nor could it be admitted, contrary to the holding of the majority, under Rule 5–802.1(a)—it simply was not offered and, therefore, could not have been admitted as a prior inconsistent statement. Hearsay, defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Md. Rule 5–801, "is not admissible" unless "otherwise provided by these rules or permitted by applicable constitutional provisions or statutes." Md. Rule 5–802. Ms. Billings' statement is hearsay. The Maryland Rules provide that such statements, or a portion of them, may be admissible under some circumstances. Rule 5–612, for example, permits a witness, for the State or any party, to use a hearsay statement, in writing, to refresh the recollection of the witness. Should the statement be so used, it is nevertheless inadmissible as evidence, unless those portions that relate to the testimony are introduced "for the

limited purpose of impeaching the witness as to whether the item in fact refreshes the witness's recollection." Md. Rule 5–612. That is not this case.

Maryland Rule 5–802.1 enunciates five (5) exceptions to this Hearsay Rule, pertaining to prior witness statements, two (2) of which are relevant to the issue in this case. Section (a) permits the admission of a hearsay statement, "reduced to writing and . . . signed by the declarant," that is "inconsistent with the declarant's testimony" and was, as relevant here, "recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement." Under Section (b), a prior consistent statement, one that is "consistent with the declarant's testimony" is admissible, but only if "offered to rebut an express or implied charge against the declarant of fabrication, or improper influence or motive." The majority is of the view that the former, rather than Rule 5–612 or Section (b), applies. While I agree that neither Rule 5–612 nor Rule 5–802.1(b) applies, I disagree that Rule 5–802.1(a) does.

The majority's holding that Ms. Billings' audio-taped statement was admitted into evidence pursuant to Rule 5–802.1(a), overlooks all indications to the contrary in the record. It also overlooks an incontrovertible fact, that, at the end of the day, when all is said and done, there was no inconsistency between Ms. Billings' trial testimony and her audio-taped statement. The prosecutor made clear what he hoped to prove with Ms. Billings' testimony:

"My whole point in calling her is to show that you can't hear the shots from the bar, and to show that the Defendant was not in the bar when the individual came in and said that Popcorn had been shot. Because as I'm sure Your Honor recalls from the Defendant's statement, he said when the shots rang out, he heard them, and he was looking Ms. Sheila [Billings] in her face. However, in the statement to the police, she stated that Goo was not in the bar when the individual came in and said somebody had been shot."

While she admittedly testified inconsistently when first asked about the petitioner's whereabouts at the critical time, after

her recollection had been refreshed, her testimony reflected no such inconsistency. Indeed, it mirrored the statement on the critical facts, whether gunshots from outside could be heard inside the bar and the petitioner's whereabouts when the shots were fired.

To begin, we look to how the issue arose. Even a cursory review of the facts underlying this case clearly demonstrates that the State's purpose in showing the transcript of her statement to the witness was solely to refresh her recollection, something clearly allowed under, and indeed contemplated by, Rule 5–612. Armed with Ms. Billings' statement that the petitioner was not in the bar when she learned that the victim had been shot, the prosecutor expected her to testify consistently. When she did not, and, in fact, testified that the petitioner was in the bar with a friend, obviously surprised, the prosecutor responded:

"I'm going to show you what I have pre-marked for identification purposes as State's Exhibit Number 5. Can you take a moment and read through that to yourself and tell me if that *refreshes your recollection* about what occurred that morning of June 1st, 2004." (emphasis added).

It is significant that, notwithstanding the contradiction in her testimony, the prosecutor did not accuse Ms. Billings of fabricating testimony, or recanting her statement; rather, he apparently attributed it, with good reason, as subsequent events proved, to the ambiguity of the statement, and to her being unable to recollect clearly. This initial use of the transcript, after Ms. Billings offered testimony that indicated some difficulty recalling the events on the night of the shooting, without anything further, establishes the purpose for which the State sought to use her out of court statement. The petitioner's objection is consistent. It was to the State's refreshing the witness' recollection. It and the bench conference it precipitated, focused not on the inconsistency of the witness' testimony, but on the necessity of its being refreshed and the use of her prior statement for that purpose:

"[Defense]: Your Honor, I object to giving the witness anything to *refresh her recollection.* She testified to

something, and she does not need the document to re-
fresh her recollection for any purpose. She was asked a
question, and she answered it.

"[The Court]: Well, if she answered the question inconsis-
tently or incorrectly with regard to her previous state-
ment, the State can certainly put the statement in front of
her, and see if that *refreshes her recollection.*"

(emphasis added).

To be sure, the inconsistency of Ms. Billings' trial testimony,
at that point, and the witness' prior statement was noted, but
it was done in the context of what was before the court for
decision, whether to allow the State to use the statement to
refresh the witness' recollection. The trial court was the first
to reference the inconsistency, and the manner in which it did
so is quite instructive, stating: "Well, if she answered the
question inconsistently or incorrectly with regard to her previ-
ous statement, the State can certainly put the statement in
front of her, and see if that refreshes her recollection." The
trial judge thus recognized inconsistency in a witness' trial
testimony and a previously given statement as a basis for
seeking to refresh the witness' recollection. The subsequent
discussion by the State, to the extent that it referenced the
inconsistency between the testimony and statement, was in the
same context and to same effect—seeking leave to use the
statement to refresh the witness' recollection. Most impor-
tant, the relief given by the court was what the State sought;
the witness was allowed to "look at her statement." It is also
relevant that, having been shown the transcript of the state-
ment, the witness responded to the State's inquiry, "[d]oes
that *refresh your recollection*?," "[y]es, it does." (emphasis
added). She confirmed that response, on cross-examination,
when the defense counsel showed her the statement a second
time.

Of course, the State did not move the witness' statement
into evidence. Indeed, it could not. It had received the ruling
it sought and, as a result, as we shall see and explore more
fully, recollection having been refreshed, the witness' testimo-

ny at trial on the point making refreshment of the witness' recollection necessary was modified so that it was consistent with her prior statement. The petitioner could have, but did not, offer the statement, or any portion of it, to impeach Ms. Billings' testimony that her recollection was refreshed. Rather, he merely sought to note a continuing objection to the "introduction" of the document to refresh the witness' recollection. To be sure, the petitioner attacked Ms. Billings' reliability—credibility—as a witness, pointing out the inconsistency and ambiguity in her statement and emphasizing the initial inconsistency of her trial testimony with that statement; however, despite that attack, Ms. Billings continued to testify consistently with her refreshed recollection.

It was only after Ms. Billings had been examined on direct, cross, re-direct, and re-cross, that the State offered her audio-taped statement into evidence. It did so despite the fact that, on the critical points, as identified by the State, Ms. Billings' testimony at trial and her audio-taped statement were totally consistent. To reiterate and emphasize, to be sure, on direct, she testified inconsistently on one point, but when her recollection was refreshed by reading her statement, she amended her testimony and, thereafter, testified entirely consistently with the statement.

### III.

The majority holds that the audio-taped statement was offered and properly admitted into evidence pursuant to Rule 5–802.1(a). Like the petitioner, I believe that, even if the statement were offered pursuant to Rule 5–802.1(a), its admission was improper: the audio-taped statement is simply not a prior inconsistent statement. Furthermore, the petitioner argues that, in any case, the trial judge failed to make the preliminary findings of fact required by Maryland Rule 5–104(a), prior to admitting the statement into evidence. On these points, also, I agree with the petitioner,[6] and dissent from the holding of the majority.

---

**6.** In offering Ms. Billings' audio-taped statement, the State said only: "I would ask that State's Exhibit 5A, the tape of this statement be moved

into evidence." The petitioner's objection was overruled, the court's entire ruling being, "[i]n it comes." The only insight we have as to the basis for both the offer and the admission is supplied by reference to the examination of Ms. Billings, whose statement is at issue. Review of that portion of the proceedings reveals not a word, after Ms. Billings' recollection had been refreshed, that would indicate that the State believed that her trial testimony was inconsistent with her audio-taped statement. Even when Ms. Billings testified differently from her statement, the State did not seek to impeach her testimony as inconsistent. Instead, it sought to use her statement to refresh her recollection. After the court overruled the petitioner's objection to its use of the statement for that purpose, it simply showed her the statement, and, as it had apparently assumed, that did the trick. To be sure, the inconsistent trial statement, the predicate for the ruling that the State could use the witness' statement to refresh recollection, was referenced by the petitioner in cross-examination, as were the ambiguities and inconsistencies in the witness' audio-taped statement, but not to establish an inconsistency between trial testimony and the witness' prior statement. They were referenced, rather, to undermine her reliability as a witness.

The majority is simply wrong in its conclusion that the trial court did not err when it failed to make required preliminary findings that would bring the audio-taped statement under Rule 5–802.1. Rule 5–104(a) provides, in relevant part, that "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court. . . ." Accordingly, we have recognized that "the court's duty is to determine whether such preliminary facts exist to support the admissibility of evidence." *Crane v. Dunn,* 382 Md. 83, 92, 854 A.2d 1180, 1185 (2004). "The court generally applies the preponderance of the evidence standard in making that determination." *Id. See also, Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144, 152–53 (1987). The record demonstrates that the trial court made no such preliminary findings of fact, in concluding that the audio-taped statement was admissible "pursuant to Maryland Rule 5–802.1(a) and/or (b). . . ." Indeed, the trial court, despite all indications to the contrary, assumed that the State sought to introduce the taped statement under Rule 5–802.1, with no demonstration that this was, in fact, the case.

The majority infers from the trial judge's reference to "inconsistency" during the bench conference on the petitioner's objection to the witness' recollection being refreshed, "inquir[ing] whether [the witness] testified 'inconsistently or incorrectly' when compared to her prior statement," that these findings were made. Op. at 252, 40 A.3d at 404. It concludes that "[t]he court's comments certainly indicate, even if not expressly, that the court admitted the statement as a prior inconsistent statement under . . . [Rule 5–802.1]." *Id.* The majority bases that conclusion on its belief that the trial court "found that the two were inconsistent." *Id.* The majority "presume[s], moreover, that the court recognized its obligations to satisfy itself of the existence of the two prerequisites for admission of the statement under that Rule." Op. at 252, 40 A.3d at 404.

The statement of a witness who testifies at trial and has been subject to cross examination regarding that statement, may be admitted into evidence pursuant to Rule 5–802.1(a) if the statement is, first, "inconsistent with the declarant's testimony," and second, as applicable here, "recorded in a substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement. . . ." Ms. Billings' statement, it is undisputed, met the second requirement. It did not qualify under the first—the statement, in fact, must be inconsistent with the testimony of the declarant. In this case, it was not.

When interviewed by Detective Ciraolo, Ms. Billings explained, in a somewhat confused manner, her recollection of events on the night of the shooting. She first stated that the petitioner was still in the bar when a girl ran in and informed her that the victim had been shot. She then equivocated,

---

The inconsistency finding was a limited "finding," if a finding at all, as I have pointed out, *supra*, and as the transcript of the bench conference makes clear. In context, as we have seen, the trial court said:

"Well, if she answered the question inconsistently or incorrectly with regard to her previous statement, the State can certainly put the statement in front of her, and see if that refreshes her recollection."

Moreover, the argument that flows from it is not persuasive. The context in which the "inconsistent" reference was made was, as indicated, during a bench conference prompted by the petitioner's objection to the State's use of the witness' prior statement to refresh her recollection; that was the focus of the discussion, not whether her testimony was inconsistent with her statement. That there was inconsistency was clear, what was not clear was the reason for it, whether it was intentional or the product of faulty memory. That question was resolved by allowing the State to refresh the witness' recollection, the very *antithesis of impeaching with a prior inconsistent statement.*

The majority misapplies Rule 5–104(a). I submit that it is not sufficient for the trial court to make preliminary findings of fact without indicating in the record what they are, what findings have been made and are being relied on. The petitioner is correct when he proffers that "the trial court did not make any of the preliminary findings of fact required under Md. Rule 5–802.1(a). . . ." (Brief of petitioner, 19.) Drawing an inference, in this regard, is even more problematic when, as here, the record is clear that the only issue addressed by the court was the permissibility of using a prior statement to refresh recollection, a matter implicating only Rule 5–612.

eventually amending her response to say that the petitioner had actually left the bar prior to her learning of the shooting. The detective clarified the sequence of events by a series of questions, the answers to which indicated that the victim left, the petitioner left, and then the girl reported the shooting. While being questioned by the State at trial, Ms. Billings testified to a different sequence—that the petitioner was still in the bar when the girl reported the shooting. This was clearly inconsistent with her statement. Therefore, in accordance with Rule 5–802.1(a), had she persisted in testifying inconsistently, the State could have impeached her with her prior inconsistent statement, and offered it into evidence. That, however, is not what occurred. Instead, the State, in accordance with Rule 5–612, over the petitioner's objection, showed Ms. Billings the transcript of her statement, which refreshed her recollection. Her recollection thus refreshed, Ms. Billings did not persist in testifying inconsistently; rather, she amended her prior trial testimony with regard to the petitioner's whereabouts when the shooting was reported and thereafter continued to testify in accordance with the audiotaped statement. Consequently, there were no grounds for admission of the statement under Rule 5–802.1(a).

Holding the statement to be correctly admitted as a prior inconsistent statement, despite the witness' amendment of her testimony, after her recollection has been refreshed, is not only factually incorrect, but it contravenes the purpose of Rule 5–802.1(a). See *Stewart v. State,* 342 Md. 230, 242, 674 A.2d 944, 950 (1996) ("The purpose of impeachment evidence is not to establish guilt, but to attack the credibility of a witness who has offered detrimental testimony."); *Bradley v. State,* 333 Md. 593, 605–06, 636 A.2d 999, 1005 (1994) ("Impeachment may be thought of as a shield [which] ... protects a party from unfavorable testimony by neutralizing that testimony ... [and] should not be used as a sword to place otherwise inadmissible evidence before the jury....". The Rule ensures that the jury is able to determine the credibility of a witness on the basis of complete information. By allowing the State to introduce Ms. Billings' statement into evidence, after

the State had already used it, successfully, to refresh the recollection of the witness, is not only wrong and illogical, it gives the State an unfair advantage. Furthermore, and most troublesome, if the majority is correct, any testimony by a witness that is inconsistent with a prior statement, whether inadvertent or corrected, as here, by having recollection refreshed, automatically will warrant the admission of the statement, thus permitting the party, here, the State, who has been able to present the very evidence it was entitled to present, to "gild the lily," and buttress its case further, with evidence that is otherwise inadmissible. That would also render Rule 5–612 surplusage and meaningless. Why should there be a Rule permitting a party to refresh a witness' memory with his or her prior inconsistent statement if the statement will be admissible, at the behest of the party who would benefit from its admission, as substantive evidence, in any event? The prohibition against the admission of hearsay evidence seeks to safeguard the accuracy and reliability of the trial process by ensuring that the jury is able to judge a witness' credibility while hearing his or her account, first-hand. *See Nance v. State,* 331 Md. 549, 559, 629 A.2d 633, 638 (1993) ("As it derives its value not solely from the credit given to witnesses reporting it, but to the perception, veracity, and competency of the declarant, hearsay evidence is generally not admissible as affirmative proof of guilt."). The majority's holding erodes this purpose by weakening the safeguards set in place by Rule 5–802.1.

## IV.

The Court should have overturned the holding of the Court of Special Appeals, and concluded that the trial court committed error when it admitted the audio-taped statement of the witness as substantive evidence subsequent to the witness' recollection already being refreshed, and there being no preliminary findings establishing that it was, in fact, admissible under any exception to the hearsay rule.

I dissent.